UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No: 00-6353-**CR-WPD**

\*\*\*\*\*\*

JEFFERSON LEVINE,

Petitioner,

versus,

UNITED STATES OF AMERICA,

Respondent.

\*\*\*\*\*\*

---

**MOTION REQUESTING MODIFICATION TO REDUCE SENTENCE
PURSUANT TO AMENDMENT 484   AND UNDER 18 U.S.C. §3582(c)(2)
AND PURSUANT TO UNITED STATES SENTENCING GUIDELINES §1B1.10**

---

JEFFERSON LEVINE
REG.NO: 55586-004
FCC COLEMAN-USP-I
POST OFFICE BOX 1033
COLEMAN,FLORIDA 33521-1033



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No: 00-6353

**JEFFERSON LEVINE,**

Petitioner,

vs.

**UNITED STATES OF AMERICA,**

Respondent.
_____/

### MOTION REQUESTING MODIFICATION TO REDUCE SENTENCE PURSUANT TO AMENDMENT 484 AND UNDER 18 U.S.C. §3582(c)(2) AND PURSUANT TO UNITED STATES SENTENCING GUIDELINES 1B1.10

The Petitioner hereby moves this Honorable Court for Modification to Reduce his Sentence pursuant to Amendment 484 of the United States Sentencing Guidelines, and pursuant to §1B1.10.

This Motion if filed pursuant to 18 U.S.C. §3582(c)(1), which gives retroactive affect to the modification of sentence under §1B1.10.

### STATEMENT OF THE FACTS SUPPORING THE REDUCED SENTENCE

On or about September 14, 2000, at Broward County, in the Southern District of Florida, the petitioner did knowingly and intentionally possess with intent to distribute in excess of five (5) grams of a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of cocaine base, commonly known as crack cocaine, in violation of Title 21 U.S.C. §841(a)(1).

1

As to Count-2, the grand jury held that on or about September 21, 2000, at Broward County, in the Southern District of Florida, the petitioner, did knowingly and intentionally possess with intent to distribute in excess of fifty (50) grams of a Schedule II controlled substance, that is, a mixture and substance containing a "detectable amount" of cocaine base, commonly known as crack cocaine, in violation of Title 21 U.S.C. §841(a)(1).

## SUMMARY OF ARGUMENT

Petitioner contends that during sentencing and trial the district court failed to make a factual findings in regards to the correct drug amount that the petitioner should have been held accoutable for.

Petitioner contends that the probation office set his Base Offense Level at 32 under 2D1.1(c)(4) and held the petitioner accoutable for 109 grams, that §2D1.1(c)(4) provides that an offense involving at 50 grams but less than 150 grams of cocaine base has a base offense level of 32.

During jury trial the jury aquitted the petitioner as to Count-1 of the indictment, and during sentencing the court did not take into account the drug amount calculation in this count was 11.8 grams.

Therefore, less the 11.8 grams, the court still held the petitioner to 97.2 grams. total weight of the analysis.

Petitioner contends that Amendment 484 which states that, for sentencing purposes, a drug mixture or substance under §2D1.1 "does not include materials that must be separted from the controlled substance before controlled substance can be used.

2

## ARGUMENT

### WHETHER THE DISTRICT COURT COMMITTED ERROR BY FAILING TO MAKE A FACTUAL FINDING IN REGARDS TO THE DRUG AMOUNT THAT PETITIONER SHOULD HAVE BEEN HELD ACCOUNTABLE FOR..UNDER AMENDMENT 484 OF THE SENTENCING GUIDELINES

Petitioner contends that this Motion is brought forth pursuant to Title 18 U.S.C. §3582(c)(2) which has been deemed criminal in nature. See United States v. Fair, 326 F.3d 1317 (11th Cir. 2003), and is therefore, subject to the rules governing criminal appeals, not civil. See, United States v. Petty, 82 F.3d 809 (8th Cir. 1996).

18 U.S.C. §3582(c)(2) applies to petitioner's sentence and therefore, he should be entitled to a reduction.

Section 3582(c)(2) provides that :

> The court maynot modify a term of imprisonment once it has been imposed except that-
>
> (2) in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has been subsequently lowered by the Sentencing Commission pursuant to 28 U.S.C. §994(o), upon motion of the defendant or the Director of Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to extent that they are applicable, if such reduction is consistent with the applicable policy statements issued by the Sentencing Commission.

In United States v. Shaw, 30 F.3d 26 (5th Cir. 1994), the Fifth Circuit explained that §3582(c)(2) only applies to retroactive guideline amendments specified in U.S.S.G. §1B1.10.

U.S.S.G. §1B1.10(a) states that:

> [w]here a defendant is serving a term of imprisonment, and the guideline range applicable to the defendant has subsequently been lowered as result of an amendment to the Guidelines Manual listed in subsection (c) below, a reduction in the defendant's term of imprisonment is authorized under 18 U.S.C. §3582(c)(2). If none of the amendments listed in subsection (c) is applicable, a reduction in the defendant's term of imprisonment under §3582 (c)(2) is not consistent with this policy statement and thus is not authroized.

3

In United States v. Miller, 903 F.2d 341 (5th Cir. 1990), the Fifth Circuit held that a sentence reduction pursuant to 18 U.S.C. §3582(c)(2) is only appropriate to the extent provided by §1B1.10 of the Sentencing Guidelines. Id. at 349.

Petitioner relies on Amendment 484 to the U.S.S.G. as the basis to reduce his sentence under 18 U.S.C. §3582(c)(2). Amendment 484 is listed in U.S.S.G. §1B1.10 and, therefore, could legally support a reduction in petitioner's sentence under §3582(c)(2).

Petitioner contends that during his trial the government called expert witness Agent Gall to the stand. See Trial Transcripts Page 82-98, during Agent Gall's testimony on page 85, Agent Gall testifiy's that he performs a variety of tests on cocaine. The first test is called a microcrystalline test. The second test involves the use of an instrument, and the Third test involves the use of reagents to determine whether or not it's cocaine base. that each one of these tests revealed the presence of cocaine.

It is further clear that during the whole testimony of Agent Gall he merely just analyzed the cocaine to check to see if it was cocaine base. At no time did Agent Gall testify about the mixtures in the cocaine base that had to be seperated in determing the true weight, and the purity of the cocaine base. It is further clear that testimony reveals that the cocaine base was weighed without any of these mixtures seperated and this amount was what the petitioner was held accountable for.

Agent Gall testified on page 94 that the total net weight was 96.4 grams, this is consistent with the 4½ ounces that was the informant purchased in count two of the indictment. This again shows that the mixture of unusable substances was not seperated, therefore, the true weight was never accomplished.

4

In the case of <u>United States v. Byfield</u>, 391 F.2d 277 (D.C.Cir.2004), the court clearly held that, Amendment 484 to U.S.S.G. § 2D1.1, which says that, for sentencing purposes, a drug "[m]ixture or substance" under § 2D1.1 does not include materials **"that must be separesed from the controlled substance before the controlled substance can be used."**

<u>Byfield</u> was convicted for possession a mixture of cocaine base (commonly known as crack) and mannitol (sugar) that weighed 607.8 grams. Applying the pre-Amendment 484 version of § 2D1.1 to that weight, the sentencing court sentenced <u>Byfield</u> to the minimum within the Level 38 range (292-365 months). The mixture, however, comprised about 340 grams (56%) cocaine base and about 340 grams (44%) mannitol, (sugar). If the mannitol "must" be seperated from the [cocaine base] before the [cocaine base] can be used <u>Byfield</u> would qualify for the level 36 sentencing range (235-293 months).

As in <u>Byfield</u> and in petitioner's case in the initial sentencing and trial record included no expert testimony that a mixture of sugar and cocaine base could be smoked. Additionally, at no time during Agent Gall's testimony was there any mention of any mixture contained in the cocaine base that was tested in petitioner trial. The government failed to meet its burden by proving beyond a reasonable doubt that the cocaine base seized in petitioner's case was smokable, or that the mixtures were smokable. All that Agent Gall done was testify about the weight, at no time did he ever testify about the mixture that was in this cocaine base. **(See Exhibit-A Trial Transcripts of Agent Gall).**

Amendment 484 to the Sentencing Guidelines amended Application Note 1 to Section 2D1.1. Application Note 1 originally provided that "[m]ixture or substance as used in this guidelines has the same meaning as 21 U.S.C. §841."

The Amendment added the exception that [M]ixture or substance does not include materials that must be separted from the controlled substance before the controlled substance can be used. The Guidelines specifically provide that Amendment 484 should be applied retroactively to determine whether, and to what extent, a reduction in sentence is warranted on a motion under Section 3582(c)(2). United States v. Innie, 77 F.3d 1207, 1209 (9th Cir.1996).

In petitioner case the government never proved any mixture in the cocaine base that was used against the petitioner during his trial, that Agent Gall never testified if the cocaine base had mixture, or mixtures that could be used in after seperation of the mixture from the controlled substance.

This Court should begin by clarifying Petitioner evidentiary burden, Section 6A1.3 of the Guidelines allows hearings [w]hen any factor important to the sentencing determination is reasonably in dispute. U.S.S.G.§6A1.3.

Section 6A1.3 sets a far lower threshold for a hearing, requiring only that an impotant factor be reasonably in dispute. See, United States v. Sisti, 91 F.3d 305, 312 (2d Cir.1996) reasonable dispute if movant has a relevant colorable claim. Also see, United States v. Small, 74 F.3d 1276, 1287 (D.C. Cir.1996) .

It is further clear that had this issue come to light during petitioner's trial, the jury could have been informed that the petitioner could also be found guilty of a lesser offense of 5 grams of cocaine base, but not more than 50 grams of cocaine base.

Again, in petitioner trial Agent Gall never testified what the mixture was in petitioner's cocaine base, his test's just proved that there was a detectable presence of cocaine base, if there was only a detectable

6

presence of cocaine base, then there had to have been other mixtures within this cocaine to have come to the weight of 96.7 grams of cocaine base.

Petitioner seeks to modiify his sentence based on post-sentencing lowering of the applicable sentencing range which petitioner does not have to prove applicability of lower range in order to obtain hearing on motion to modify, rater, petitioner only needs to establish that important factors relevant to applicability is "reasonably in dispute." §3582(c)(2); U.S.S.G. §§ 1B1.10, 6A1.3.

Sentencing Guidelines provisions allowing a hearing for "resolution of disputed factors" applies to sentence modifications as well as to intial sentencing.

Petitioner should be entitled to a sentencing hearing under Amedment 484, that the government falied to meet is burden of proof in determining the true weight of the cocaine base in petitioner's trial and sentencing.

By denying the petitioner an evidentiary hearing on this matter would be an abuse of discretion on the court in denying a §6A1.3 hearing.

The petitioner should be allow to produce his own expert witness to testify as to whether the mixture in the cocaine base was only a cutting agent, or a mixture that had to be seperated.

Petitioner has colorable claims, and an evidentiary hearing would be the only way to bring the true facts of this argument out. Therefore, the petitioner should be entitled to this hearing and be allowed to produce his own expert witness to testify to petitioner claims.

## CERTIFICATE OF SERVICE

I hereby certify that the Modification of Sentence is true and correct and was forwarded by U.S. Mail postage prepaid to the below listed parties.

Clerk of the Court
United States District Court
Southern District of Florida
Miami Division
301 N. Mia. Ave. RM#150
Miami, Florida 33128-7788

Laurence Bardfeld
AUSA
500 E.Broward Blvd. 7th Floor
Ft. Lauderdale, Fl. 33301

Executed on this the 20 day of June 2006.

Respectfully submitted,

Jefferson Levine
Reg. No: 55586-004
FCC Coleman-USP-I
P.O. Box 1033
Coleman,Fl.33521-1033

8

**EXHIBIT-A**

**E X H I B I T - A**

**TRIAL TESTIMONY OF AGENT GALL**

Gall - Direct

1    BY MR. BARDFELD:

2    Q.    How are you employed?

3    A.    I am employed by the Broward County Sheriff's Office in

4    the crime lab.

5    Q.    And how long have you been employed at the crime lab at

6    Broward Sheriff's Office?

7    A.    Since March of 1997.

8    Q.    And what do you do at the Broward County crime lab?

9    A.    My principal duties include the analysis of evidence for

10   the presence of a controlled substance.

11   Q.    Does that mean you are a chemist?

12   A.    Yes, I am.

13   Q.    What is your background and experience in chemistry?

14   A.    I have a Bachelor's Degree in chemistry from the

15   University of Central Florida.

16         I have a Master's Degree also in chemistry from Emory

17   University in Atlanta, Georgia.

18         I received on-the-job training while employed with

19   the Sheriffs Office.  And I attended a training seminar

20   sponsored by the DEA.

21   Q.    And you said that you started in '97.

22         What did you do before that?

23   A.    Before that I tested drinking water samples in the State

24   of Georgia.

25   Q.    Okay.  But you worked as a chemist?

Gall - Direct

1   A.   Yes, I did.

2   Q.   Have you ever been qualified as an expert to testify on

3   controlled substances in state or federal court?

4   A.   Yes, I have.

5   Q.   And on how many occasions?

6   A.   Over 100.

7        MR. BARDFELD:   I move to have this witness declared

8   an expert.

9        THE COURT:   Mr. Barrar?

10       MR. BARRAR:   No objection.

11       THE COURT:   Okay.   The Court will receive Mr. Gall as

12  an expert.

13       You may proceed.

14  Q.   Did you have occasion to analyze cocaine that was seized

15  relating to an investigation of Jeffrey Levine?

16  A.   Yes, I did.

17  Q.   And what were the circumstances of that?   How does it

18  normally work?   How do you get to analyze particular controlled

19  substances?

20  A.   Evidence is brought into the laboratory.   It is signed in

21  by one of our two evidence custodians usually.   And then I

22  receive it from one of them.

23  Q.   And who brings it into the laboratory?

24  A.   Depending on which agency is submitting the evidence.

25  Sometimes it is the police officers themselves.   Sometimes they

84

Gall - Direct

1   are just couriers for the police agency.

2   Q.   Okay.  So, in other words, you don't go out to a crime

3   scene and pick up the controlled substances at that time, do

4   you?

5   A.   No, I do not.

6   Q.   Okay.  Tell the ladies and gentlemen of the jury what you

7   analyze for and what kind of analysis you do?

8   A.   The most common analysis I do is for cocaine.  That's

9   probably around 70 percent of the analysis that I do.

10  Q.   Okay.  I show you what's been identified -- and I don't

11  know if it's been introduced -- as Government's Exhibit Number

12  1.

13           Can you identify this?

14  A.   Yes, I can.

15  Q.   What is that?

16  A.   It is evidence that I received for this case.

17  Q.   How did you receive that?  Who turned it in and what

18  happened?

19  A.   I received it from one of our two evidence custodians for

20  analysis.

21  Q.   And who turned it into the evidence custodian?

22           MR. BARRAR:  Objection, Your Honor.  It's hearsay.

23           THE COURT:  Sustained.

24  Q.   In the normal course of your investigation do you get it

25  from an evidence technician?

Gall - Direct

```
 1    A.    Yes, I do.

 2    Q.    What did you do in your analysis?

 3    A.    This particular piece of evidence, I had three items that

 4    I tested.

 5    Q.    Okay.  What did you do?

 6    A.    I opened up the evidence and I proceeded to take samples

 7    for testing.

 8    Q.    Okay.  And how did you do the testing?  What happened?

 9    A.    I perform a variety of tests on the material.  The first

10    test is called a microcrystalline test.  The second test

11    involves the use of an instrument.  And the third test involves

12    the use of reagents to determine whether or not it's cocaine

13    base.

14    Q.    Okay.  And after the first test what, if anything, did you

15    conclude?

16    A.    On the first test, which is the microcrystalline test,

17    each one of the exhibits that I tested revealed the presence of

18    cocaine.

19    Q.    Okay. Do you determine whether or not there is cocaine

20    base?

21    A.    Yes, I did.

22    Q.    Okay.  Can you explain to the members of the jury what the

23    difference is between cocaine and cocaine base?

24    A.    The difference is basically form.  One is what is called

25    an acid salt, and that's typically the powder form.
```

86

Gall - Direct

1           And the second form, which is cocaine base, that is

2    what is commonly referred to as crack.

3    Q.    In this case what did your analysis reveal?  What did you

4    conclude after analyzing Government's Exhibit Number 1?

5    A.    All three of the exhibits that were tested revealed the

6    presence of cocaine base.

7    Q.    How much -- can you describe what the three exhibits you

8    are talking about?

9    A.    The first exhibit is a plastic bag that contained suspect

10   cocaine rocks.

11   Q.    Can you show the members of the jury what you are

12   referring to?

13           Do you have that in front of you in Government's

14   Exhibit Number 1?

15   A.    I can get it out.

16   Q.    Okay.

17   A.    This one -- he cannot see this, but it is labeled item 1.

18   This is the plastic bag that contains suspect cocaine rocks.

19   Q.    And who labeled it item 1?

20   A.    I did.

21   Q.    Okay.  And tell the members of the jury what your

22   conclusion was as you analyzed that?

23   A.    That item revealed the presence of cocaine base.

24   Q.    Did you weigh that?

25   A.    Yes, I did.

87

Gall - Direct

1    Q.    And what was the weight of that?

2    A.    The weight was 11.8 grams.

3    Q.    What about the next part of Government's Exhibit Number 1?

4    A.    The next item is the plastic bag, and inside it are 12

5    green plastic bags each containing suspect cocaine rock.

6    Q.    Okay.  And where did you get that from?

7    A.    That was in with this other evidence.

8    Q.    Okay.  So that would have come from your evidence

9    technician?

10    A.    I actually received all three exhibits in one heat sealed

11    plastic bag.

12    Q.    So it would have been really Government's Exhibit Number 1

13    that was subdivided into three -- you subdivided it into three

14    different exhibits, is that right?

15            MR. BARRAR:  Objection.  Leading.

16            THE COURT:  Overruled.

17    A.    Yes, sir.

18    Q.    Tell us about your number 2 in Government's Exhibit Number

19    1.

20    A.    In item 2 there were 12 green plastic bags.  I chose one

21    at random, and I tested it, and it also revealed the presence

22    of cocaine base.  The net weight inside the one bag that I

23    tested was 1.2 grams.  The total net weight of the cocaine

24    rocks in all the bags in item 2 was 15.8 grams.

25    Q.    Okay.  What about the sub-part 3 of that?

Gall - Direct

1   A.   Okay.  It is -- should I hold it up?

2   Q.   Please.

3   A.   It's another plastic bag that contains the suspect cocaine

4   rock.  And I labeled it item number three.

5   Q.   What did you determine as you analyzed that?

6   A.   It also revealed the presence of cocaine base.  And its

7   net weight is less than one gram.

8   Q.   Okay.  So the total amount of Government's Exhibit Number

9   1 was how much?

10   A.   27.3 grams.

11   Q.   And what you did is you added the total amounts of your

12   subdivision 1 2 and 3?

13   A.   Yes, I did.

14   Q.   I am sorry.  You said it was cocaine base?

15   A.   Yes, I did.

16   Q.   Do you know what that's commonly referred to as?

17   A.   It's commonly referred to as crack.

18   Q.   Did you have occasion to examine any more evidence that

19   was presented to you on this case?

20   A.   Yes, I did.

21   Q.   I show you what's been marked as Government's Exhibit

22   Number 2.

23        Can you identify this?

24   A.   Yes, I can.

25   Q.   And what does that reveal?

Gall - Direct

1    A.    Excuse me?

2    Q.    I am sorry.   What is Government's Exhibit Number 2?

3    A.    It has a variety of objects in it.   It has an empty brown

4    paper bag.   It has two plastic bags containing suspect cocaine

5    rocks.   And then I had another plastic bag that contained four

6    bags that contained suspect cocaine rocks.

7    Q.    Okay.   So you also subdivided Government's Exhibit Number

8    2, is that correct?

9    A.    I didn't actually subdivide it.   I grouped it altogether

10   as one item, but I tested each one of the bags.

11   Q.    And where did you obtain that particular evidence?

12   A.    Again I obtained it from one of our two evidence

13   custodians.

14   Q.    Okay.   And where would they have obtained it?

15            MR. BARRAR:   Objection.   Hearsay.

16            THE COURT:   Sustained.

17            MR. BARDFELD:   Can we approach, Your Honor?

18            THE COURT:   Okay.

19            (Sidebar conference on the record.)

20            MR. BARDFELD:   My only question is this:   Am I going

21   to need to call the evidence custodian in to admit it?

22            THE COURT:   It's in evidence.

23            MR. BARDFELD:   Oh, it is in.

24            THE COURT:   Yes.

25            MR. BARRAR:   Subject to a motion to strike.

Gall - Direct

```
1         THE COURT:  All right.  If it was received by him in
2   a sealed condition, I don't know that you need the evidence
3   custodian.
4         MR. BARDFELD:  Okay.  That's what I was just
5   concerned about.
6         THE COURT:  I don't know that the evidence
7   custodian's evidence is hearsay if he has a business record,
8   but, you know, it's in evidence at this point.
9         (End of sidebar conference.)
10  Q.  Can you describe Government's Exhibit Number 2?
11  A.    It was a heat sealed plastic bag that contained an empty
12  brown paper bag, two plastic bags that contained suspect
13  cocaine rocks, and another bag that contained four bags
14  containing suspect cocaine rocks.
15  Q.  Okay.  When you say "suspect cocaine rocks," what do you
16  mean by that?
17  A.  They have the appearance of what I consider to be a piece
18  of crack.
19  Q.  Okay.  But it was suspect only before you analyzed it, is
20  that right?
21  A.  That is correct.
22  Q.  Okay.
23         Now, talk to us about the heat sealing, the way it
24  was presented to you.
25  A.    I received the evidence in a heat sealed plastic bag from
```

Gall - Direct

1    one of our two evidence custodians.

2    Q.    And what's the purpose of that?

3    A.    That's to show that the evidence has not been tampered

4    with.

5    Q.    Okay.  And after you get the heat-sealed envelope, what,

6    if anything, did you do with Government's Exhibit Number 2?

7    A.    I tested each one of the bags.

8    Q.    Okay.  And what did you test for?

9    A.    I tested -- well, in this case I found cocaine base.

10   Q.    Okay.  Can you tell the members of the jury how you did

11   the analysis and what your conclusions were?

12   A.    Again, I performed the same test that I performed on the

13   previous evidence.  I performed a microcrystalline test, an

14   instrumental test, and then a test using reagents to

15   specifically test for cocaine base.

16   Q.    Again, as to the first test, what happens?  Can you just

17   describe it briefly?

18   A.    I take a small amount of material.  I mix it with reagents

19   age on a microscope slide, and then I look at the crystals, the

20   solid that is formed using the microscope.

21   Q.    And what are you looking for?

22   A.    I am looking for crystals that are characteristic of a

23   cocaine complex with the reagents.

24   Q.    As a result of that particular test, what is your

25   conclusion as to what Government's Exhibit Number 1 -- I mean,

Gall - Direct

1  Government's Exhibit Number 2 is?

2  A.    The evidence revealed the presence of cocaine.

3  Q.    What about the second test that you did on this?

4  A.    The second test uses an instrument called a gas

5  chromatograph mass spectrometer.

6  Q.    Gas chromatograph mass spectrometer?

7  A.    It's an instrument -- one of the instruments that we can

8  use to determine what a substance is.

9  Q.    Why do you use more than one test?

10  A.    It's the policy of our laboratory to do more than one test

11  on an exhibit before we will report it out as positive.

12  Q.    In this particular instance what were the results of your

13  analysis according to test number two?

14  A.    That test also revealed the presence of cocaine.

15  Q.    How about the third test that you performed on this

16  particular Government's Exhibit Number 2?

17  A.    The third test involves the use of reagents, and that is

18  specifically to test to determine whether or not it's cocaine

19  base.

20  Q.    And did you do that as to Government's Exhibit Number 2?

21  A.    Yes, I did.

22  Q.    And what were the results of that particular test?

23  A.    Those revealed the presence of cocaine base.

24  Q.    So what is your conclusion as to Government's Exhibit

25  Number 2?

93

Gall - Direct

1   A.    Each one of the six plastic bags --

2   Q.    Can you show the members of the jury what you are

3   referring to?

4   A.    I have got the two bags that were essentially loose inside

5   this other brown paper bag.  And then I have got four other

6   bags that were inside the plastic bag.

7   Q.    Okay.  Can you show the plastic bag in the paper bag that

8   you are referring to?

9   A.    This is the plastic bag that contained the four bags.

10          This is the empty brown paper bag.

11          And this is the brown paper bag that had contained

12   all of the exhibits.

13   Q.    Okay.  Can you explain that -- the brown paper bag that

14   you have in your hand, what's on that?

15   A.    There is a variety of writing.

16   Q.    Okay.  And what's the tape on there?

17   A.    The tape is the seal --

18   Q.    Okay.

19   A.    -- to show that it was closed when I received it.

20   Q.    Okay.  And how was that given to you?

21   A.    I received it inside another bag.

22   Q.    Okay.  Inside a heat sealed --

23   A.    Inside a heat sealed plastic bag, yes, sir.

24   Q.    Okay.  The conclusion as to Government's Exhibit Number 2

25   was that it contained -- I am sorry -- cocaine base?

94

Gall - Direct

```
 1   A.   All six bags revealed the presence of cocaine base.

 2   Q.   Okay.  Did you have occasion to weigh Government's Exhibit

 3   Number 2?

 4   A.   Yes, I did.

 5   Q.   And what was the weight of the cocaine base that was found

 6   in Government's Exhibit Number 2?

 7   A.   The total net weight was 96.4 grams.

 8              MR. BARDFELD:  I have no further questions, Your

 9   Honor.

10              THE COURT:  Cross examination?

11                          CROSS EXAMINATION

12   BY MR. BARRAR:

13   Q.   Good afternoon.

14   A.   Good afternoon.

15   Q.   Do you go by Officer Gall or --

16   A.   No.  Mr. Gall.

17   Q.   But you are employed by the Broward Sheriff's Office?

18   A.   Yes, I am.

19   Q.   Okay.  And get paid by the Broward Sheriff's Office?

20   A.   Yes, I do.

21   Q.   Okay.  All right.  So you would be considered part of law

22   enforcement?

23   A.   Even though I am a civilian, I am employed by a police

24   agency.

25   Q.   Okay.  You just don't wear a uniform and go out on the
```

95

Gall - Cross

1   street and things like that?

2   A.    I am not a deputy or anything like that, no.

3   Q.    Okay.  All right.

4        Have you ever been wrong in your analysis of a

5   substance?

6   A.    Not that I can recall.

7   Q.    Not ever?

8   A.    No.

9   Q.    Okay.

10        Now, you prepared reports in this case, did you not?

11   A.    Yes, I did.

12   Q.    Okay.  Have you done any additional testing of either

13   Government's Exhibit 1 or Government's Exhibit 2 since you

14   prepared those reports?

15   A.    I have prepared a total of three reports.

16   Q.    Okay.

17   A.    So since my last report, no, sir.

18   Q.    Okay.  And do you have those reports at your disposal?

19   A.    Yes, I do.

20   Q.    Okay.

21        Now, with all the evidence that you have been

22   presented in Government's Exhibit 1 and Government's Exhibit 2,

23   it was only Government's Exhibit 2 that had six bags, right --

24   six separate plastic bags?

25   A.    Item -- let's see -- see, Exhibit 2 is the one that had

Gall - Cross

1    six plastic bags.

2    Q.    Okay.  And you testified on direct examination that you

3    tested all six bags?

4    A.    Yes, I did.

5    Q.    Okay.  Isn't it a fact, Mr. Gall, that you only tested two

6    of those bags?

7    A.    No, it is not.

8    Q.    Take a look at your report dated October 5th of 2000.

9          (Pause.)

10   Q.    Okay.  You have your report dated October 5th of 2000 in

11   front of you?

12   A.    Yes, I do.

13   Q.    And that's report with lab number 0000020117?

14   A.    Yes, it is.

15   Q.    And it says -- correct me if I am wrong -- 36.7 grams

16   total net weight in the two bags tested?

17   A.    That is correct.

18   Q.    Correct?

19   A.    Yes, sir.

20   Q.    Nothing in this report reflects that you tested the four

21   other bags?

22   A.    That is correct.

23   Q.    And the total weight of this analysis, which is

24   Government's Exhibit 2, you say in your report is 97.2 grams,

25   correct?

Gall - Cross

1    A.    That is correct.

2    Q.    And that's all six bags?

3    A.    That is correct.

4          MR. BARRAR:  Thank you.  Nothing further.

5          THE COURT:  Redirect?

6                    REDIRECT EXAMINATION

7    BY MR. BARDFELD:

8    Q.    Did you test the other four bags at some later date?

9    A.    Yes, I did.

10   Q.    And when was that?

11   A.    The report is dated December 12th of the year 2000.

12   Q.    And what did you find as a result of that testing?

13   A.    The total net weight was 59.6 grams, total net weight in

14   the additional four bags tested.

15   Q.    Okay.  So you just retested bags that you hadn't

16   originally tested?

17   A.    That's correct.

18         MR. BARDFELD:  I have no further questions.

19         THE COURT:  Anything further, Mr. Barrar?

20         MR. BARRAR:  Just one question.

21                    RECROSS EXAMINATION

22   BY MR. BARRAR:

23   Q.    Would you add 59.6 to 36.7 and tell me what you get?

24   A.    96 point -- wait a minute.

25              (Pause.)

Gall - Recross

```
1    A.    96.3.

2    Q.    Not 96.4, is it?

3    A.    That is correct.

4              MR. BARRAR:  Thank you.

5              THE COURT:  Anything further, Mr. Bardfeld?

6              MR. BARDFELD:  No, Your Honor.

7              THE COURT:  Thank you, sir.  You may step down and

8    you are excused.

9              (Witness complies.)

10             THE COURT:  Anything further, Mr. Bardfeld?

11             MR. BARDFELD:  Yes, Your Honor.  We would call

12   Detective Bill Cunneen.

13             WILLIAM CUNNEEN, PLAINTIFF'S WITNESS, SWORN.

14             THE COURT:  Please be seated.

15             State your full name and spell your last name for the

16   record.

17             THE WITNESS:  William Cunneen, C-u-n-n-e-e-n.

18                        DIRECT EXAMINATION

19   BY MR. BARDFELD:

20   Q.    How are you employed?

21   A.    The Broward County Sheriff's Office.

22   Q.    How long have you been with the Broward Sheriff's Office?

23   A.    Nine-and-a-half years.

24   Q.    What are your duties and responsibilities as a detective

25   of the Broward Sheriff's Office?
```